# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DONALD SHARP,            )
                         )
    Plaintiff,      )
                         )
    v.              )    No. 15-cv-00413
                         )
                         )    Judge Andrea R. Wood
NAVISTAR INTERNATIONAL   )
CORPORATION and NAVISTAR INC., )
                         )
    Defendants.     )

## MEMORANDUM OPINION

Plaintiff Donald Sharp brings this action against Defendants Navistar International Corporation and Navistar Inc. (collectively, "Navistar") in connection with his termination from Navistar, where he served as a Senior Vice President. Sharp contends that Navistar failed to pay him what he was entitled to under the severance agreement between the parties. Sharp initially filed suit in the Circuit Court of Cook County, Illinois, Law Division, and Navistar removed the case to this Court. Before the Court is Sharp's renewed motion to remand ("Motion") (Dkt. No. 32). For the reasons stated below, the Court finds that this case was properly removed and therefore denies the Motion.

## BACKGROUND

In his Complaint, Sharp alleges that while serving as a Senior Vice President in Navistar's Enterprise Services, he entered into a contract with Navistar concerning the severance payments and benefits that Navistar would be obligated to pay him in the event that his employment were to be terminated (the "Executive Severance Agreement" or "ESA"[1]). (Compl. ¶¶ 4–5, Dkt. No. 1-1.)

---

[1] Although Navistar refers generally to the severance agreements that it offers its executives as Executive Severance Agreements, the particular agreement at issue here is an individual contract concerning only

Under the ESA, the amount of severance due to Sharp would depend on a variety of factors, including whether he was terminated within the 36 months following a "Change in Control of the Company." (*Id*. ¶¶ 6–8; Notice of Removal ¶ 6, Dkt. No. 1.) In the summer or fall of 2012, according to Sharp, such a change in control occurred. (Compl. ¶¶ 10–13, Dkt. No. 1-1.) He was terminated several months later, which he felt entitled him to certain enhanced severance payments and other benefits under the ESA. (*Id*. ¶ 14.) Navistar disagreed, and paid him only the severance he would be due in the absence of a change in control, prompting Sharp to bring suit in the Circuit Court of Cook County, Illinois, Law Division asserting claims for violation of the Illinois Wage Payment and Collection Act and breach of contract.

Navistar removed to the case to this Court, asserting that Sharp's causes of action are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"). In particular, Navistar asserts that Sharp's claims are preempted because "[u]nder the ESA, Navistar cannot prepare for one exclusive situation that would trigger its severance liability," "the ESA requires Navistar to exercise discretion in determining what its obligations to ESA executives are in the event they terminate employment," and Navistar "has an ongoing obligation to monitor its ability to pay various compensation amounts" and "an ongoing responsibility to pay other benefits 'on a regular basis' even after the executive's employment is terminated." (Notice of Removal ¶¶ 20–25, Dkt. No. 1.) Sharp filed a motion to remand and requested permission to conduct discovery on the issue of remand, which the Court granted. After that discovery was completed, Sharp filed a renewed motion to remand, which is the motion currently before the Court.

---

Sharp's severance, which the Court refers to as the "ESA." In addition, although Sharp signed successive severance agreements during his tenure at Navistar, there appears to be no material difference between the agreements for purposes of the issue at hand, and the Court will refer to them collectively as the "ESA."

Although the parties have differing positions regarding whether the ESA is an ERISA plan, the following facts regarding the ESA appear to be undisputed. While Navistar provides similar severance agreements to its executives, the ESA is an individual contract between Sharp and Navistar governing only Sharp's severance, with the particular benefits due to him dependent upon his executive employment "tier" at termination. (Pl. Mot. at 4–5, Dkt. No. 32; Notice of Removal ¶¶ 4–5, Dkt. No. 1; Def. Opp'n at 3, Dkt. No. 38.) Aside from this litigation, Navistar has not explicitly characterized the ESA as an ERISA plan, nor does the ESA make any reference to ERISA. (Pl. Mot. at 5, Dkt. No. 32; Notice of Removal ¶ 5, Dkt. No. 1; Def. Opp'n at 15, Dkt. No. 38.) Pursuant to the ESA, if terminated, Sharp would be entitled to lump-sum payments based on his base salary and his annual target incentive—the portion based on his base salary would be paid shortly after his termination, and the portion based on his annual target incentive would be paid at the end of the year in which he is terminated (*i.e.*, when Navistar calculates the incentive amount due for all of its employees). (Pl. Mot. at 5–6, Dkt. No. 32; Def. Opp'n at 3, 9–10, Dkt. No. 38; Pl. Reply at 3, Dkt. No. 39.) The amount of the lump sum payments due to Sharp under the ESA would be dependent on a variety of additional factors, including whether he is terminated for "good reason" or "for cause," whether he suffers a "constructive termination" (*e.g.*, a "material diminution" of authority, duties, or responsibilities), and whether his termination is within 36 months after a "change in control" on the company's Board of Directors. (Pl. Mot. at 10, Dkt. No. 32; Notice of Removal ¶¶ 6, 22, Dkt. No. 1; Def. Opp'n at 4, 12, Dkt. No. 38.)

In addition to lump sum payments, the ESA provides that, if terminated, Sharp would receive 24 months of continued healthcare coverage and life insurance coverage, outplacement benefits, and other benefits. (Pl. Mot. at 7, Dkt. No. 32; Notice of Removal ¶ 5, Dkt. No. 1; Def. Opp'n at 3, 10, Dkt. No. 38.) With respect to health insurance, Sharp would be entitled to

continue his coverage under Navistar's health insurance program for two years, with one year of continuing to pay the same percentage of the applicable premium that he was paying while employed, followed by a year of paying at his own cost. (Pl. Mot. at 7, Dkt. No. 32.) With respect to outplacement benefits, Sharp would be entitled to accept the services from one of two outside service providers paid for by Navistar, or instead to receive a direct payment of the amount Navistar would pay for those services ($19,000). (Pl. Mot. at 8, Dkt. No. 32.) The other benefits include the right to "grow into" additional benefits under a Navistar retirement plan and forgiveness of the obligation to repay money that Navistar advanced for "perks" such as country club memberships. (Pl. Mot. at 8, Dkt. No. 32.)

In light of its obligations under its various severance agreements with executives, Navistar continuously monitors its ability to pay the severance benefits, which can be substantial—for example, Sharp received a seven-figure separation payment as a result of his termination. (Pl. Mot. at 9, Dkt. No. 32; Def. Opp'n at 2, 5, Dkt. No. 38.) In addition, Navistar monitors its former executives' post-Navistar employment and the press to determine whether the departed executives are in violation of any restrictive covenants to which they are bound in connection with their severance agreements—Sharp is bound by such a covenant. (Pl. Mot. at 7, Dkt. No. 32; Pl. Reply at 5, Dkt. No. 39; Def. Opp'n at 13, Dkt. No. 38.)

## DISCUSSION

"When a plaintiff files suit in state court but could have invoked the original jurisdiction of the federal courts, the defendant may remove the action to federal court. . . . The party seeking removal has the burden of establishing federal jurisdiction, and federal courts should interpret the removal statute narrowly, resolving any doubt in favor of the plaintiff's choice of forum in state court." *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 758 (7th Cir. 2009) (citing 28 U.S.C.

§ 1441(a)). Navistar, as the party seeking removal, bears the burden of establishing federal jurisdiction by a preponderance of the evidence. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006).

Pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1132(e), federal jurisdiction exist in this case if the claims at issue fall within the scope of the ERISA statute. "Complete preemption, really a jurisdictional rather than a preemption doctrine, confers exclusive federal jurisdiction in certain instances where Congress intended the scope of a federal law to be so broad as to entirely replace any state-law claim. ERISA is such an area." *Franciscan Skemp Healthcare, Inc. v. Cent. States Joint Bd. Health & Welfare Trust Fund*, 538 F.3d 594, 596 (7th Cir. 2008). "[T]he preemptive force of ERISA is so powerful that it converts 'a state law claim into an action arising under federal law,' even if the plaintiff does not want relief under ERISA. This is true even though the same facts might be sufficient to state a state law cause of action." *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1490 (7th Cir. 1996) (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 64 (1987)). To determine whether ERISA preemption applies, courts in the Seventh Circuit consider: (1) if the claim(s) could have been brought under ERISA § 502(a)(1)(B), and (2) whether there is another independent legal duty that is implicated by the defendants' actions. *Franciscan*, 538 F.3d at 597. Here, only the first inquiry is in dispute— whether the claims stemming from the ESA,[2] a severance plan, could have been brought under ERISA § 502(a)(1)(B). (*See* Pl. Mot. at 3, Dkt. No. 32.)

As the Seventh Circuit has explained, the inquiry is fact-specific, and it may not be easy to draw the line in preemption cases, but "[t]here is no middle ground in these cases; either [the]

---

[2] The fact that the ESA governs only Sharp's termination does not preclude it from constituting an ERISA plan. *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1376 (7th Cir. 1997) *abrogated by Int'l Union of Operating Engineers, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427 (7th Cir. 1998) ("[W]e have no difficulty in holding that it is possible for a one-person arrangement to qualify as an ERISA plan.").

plan is preempted by ERISA or it is not." *Collins v. Ralston Purina Co.*, 147 F.3d 592, 597 (7th Cir. 1998). For a plan to be preempted by ERISA, it must require an "ongoing administrative scheme" and its terms must be "reasonably ascertainable." *Cvelbar v. CBI Illinois Inc.*, 106 F.3d 1368, 1374 (7th Cir. 1997) *abrogated by Int'l Union of Operating Engineers, Local 150, AFL-CIO v. Rabine*, 161 F.3d 427 (7th Cir. 1998). There does not appear to be any meaningful dispute in this case that the terms of the ESA are reasonably ascertainable.[3]

To determine whether a plan requires an ongoing administrative program, "[t]he pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits. Simple or mechanical determinations do not necessarily require the establishment of such an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employee's eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria." *Id*. at 1375 (quoting *Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 257 (8th Cir.1994)). Factors that may be relevant include: (1) whether the severance benefits are paid out in one lump sum or over time; and (2) whether the employer's payment of benefits requires managerial discretion in its administration. *Id*. at 1376–77. "ERISA applies when a severance plan potentially places periodic demands on [an employer's] assets that create a need for financial coordination and control. In contrast, [t]he requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation, and ERISA therefore does not apply." *Bowles v. Quantum Chem. Co.*, 266

---

[3] Although Sharp argues that there is ambiguity with respect to Navistar's use of "templates" for its executive severance agreements, Sharp does not argue that this alleged ambiguity renders the terms of the ESA not reasonably ascertainable (only that it "diminish[es]" the ascertainability of the terms of the broader executive severance scheme). (Pl. Reply at 1, Dkt. No. 39.)

F.3d 622, 631 (7th Cir. 2001) (internal citations and quotation marks omitted; substitutions in original).

The Court notes that Navistar's failure to explicitly characterize the ESA as an ERISA plan does not have much bearing on the issue—the actual characteristics of the plan, not any party's characterization, determines whether it is an ERISA plan. *See Cornell v. BP Am. Inc.*, No. 14 C 2123, 2015 WL 5766931, at *5–*7 (N.D. Ill. Sept. 30, 2015) (finding that plans constituted ERISA plans even though the employer admitted its failure to comply with the formal requirements for ERISA plans). Here, the Court finds that the ESA is an ERISA plan in light of the managerial discretion required of Navistar to pay the benefits under the plan. In particular, Navistar would have to exercise a significant amount of discretion under the ESA because in order to determine the amount of severance due to Sharp, Navistar would have to determine whether he was terminated "for cause," whether he suffered a "constructive termination," and whether his termination followed a "change in control."

The ESA is not a plan for which the only obligation would be a one-time payment. *See Collins v. Ralston Purina Co.*, 147 F.3d 592, 596 (7th Cir. 1998) (distinguishing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987)). Nor is this a plan under which the only determination to be made would be whether Sharp was terminated "for cause." *See Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 633 (7th Cir. 2001) (distinguishing *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir.1997)); *Ankenbruck v. Rochester Midland Corp.*, No. 1:05-CV-86-TS, 2006 WL 2524116, at *4 (N.D. Ind. Aug. 30, 2006); *Schwartz v. Opportunity Int'l, Inc.*, No. 14-CV-5775, 2015 WL 300591, at *4 (N.D. Ill. Jan. 21, 2015). Instead, under the ESA, Navistar would have to maintain an ongoing administrative scheme to make determinations such as whether Sharp (and other executives) suffered a "material diminution" of authority, duties, or

7

responsibilities, and be prepared to potentially face multiple demands by executives who felt they had suffered such a "constructive termination." *Collins*, 147 F.3d at 596 ("Only an ongoing administrative scheme would allow the company to develop a working definition of 'substantial reduction of duties or responsibilities,' such that it could be consistently applied either to a single employee on multiple occasions or multiple employees on multiple occasions."). Furthermore, Navistar would be faced with the obligation to make such individualized determinations over a protracted period of time—the obligation would arise only once Sharp was terminated, which could be at any point during his employment, and an enhanced payment obligation could arise anytime within 36 months following a "change in control." *See id*. at 595–97 ("The individual retention agreements required the company to budget for the prospect of paying out disbursements of varying amounts to its managers and at varying times. . . . Prolonged individualized decision-making concerning benefits describes a plan subject to ERISA, and preempted by it."); *see also Cornell*, 2015 WL 5766931, at *7. In addition, pursuant to the ESA, Navistar would also have to monitor Sharp's compliance with his restrictive covenants—further evidence of the necessity of an ongoing administrative scheme. *Cvelbar*, 106 F.3d at 1377.

The Court is unpersuaded by Sharp's argument that the decisions to be made by Navistar in connection with his (and other executives') termination are simple mechanical decisions that Navistar would make even in the absence of a severance scheme. (*See* Pl. Mot. at 10–11, Dkt. No. 32.) It is unclear why Navistar would have to undertake determinations as to whether an executive suffered "constructive termination" or was terminated following a "change in control" outside of the severance context. That Navistar's obligations to Sharp under the ESA did not consist of simple mechanical determinations is only underscored by the fact that Sharp's termination has

resulted in this litigation regarding whether there was a "change in control" and what Sharp is actually due under the ESA.

## CONCLUSION

For the foregoing reasons, Navistar has shown that removal of this action was proper and thus Sharp's renewed motion to remand (Dkt. No. 32) is denied.

ENTERED:

Dated: September 30, 2017

_____
Andrea R. Wood
United States District Judge